IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CIVIL ACTION FILE NO. 3:24-cv-716

| | | |
|---|---|---|
| LESSIE THOMAS, Power of Attorney for JAMIL STAFFORD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| GARRY L. MCFADDEN, SHERIFF OF MECKLENBURG COUNTY in his individual and official capacity; SHELITA JONES, LPN/LVN; JAMIE DAVIS, RN; DANIEL BIONDI; ATIA MARIE LIAGHAT NUNNALLY, NP; FALIE LOUIS, RN; DANIELA SANCHEZ; ROSHAUNDA FRIDAY, RN; SHARETTE WILLIAMS; DAVID OWENS, LNP; ANNETTE BLACK; ALICIA RIVERS, LPN; IRENE DAWSON; JANIKA CAMPBELL, CNA; JENNIFER DEAN, LPN; JASMINE ROBINSON, MA/LNA; LINDA VALERA, LPN; MARY RAUDEBAUGH, LPN; QUASHONDA ANDERSON, LPN/LVN; SAMUEL MORTU, MA/LNA; SHANTA SMITH, MA/LNA; TOSHIA SARKOR, LPN/LVN; LINDA ASBURY, RN; ATIYA TORRENCE, LPN; ANTOINETTE THOMAS, LPN/LVN; DESTINY MEEKS, LPN/LVN; DAVID SHKINDER, LPN; JAKIEA WILLIAMS, LPN; LATISHA HENRY, LPN/LVN; VICTORIA CORDOVA, LPN; ESTER ADEDOKUN, RN; KENDRA BROWN, LPN/LVN; NURSE THOMPSON; UNKNOWN WELLPATH PROVIDERS; WELLPATH LLC; LIBERTY MUTUAL INSURANCE COMPANY; and PLATTE RIVER INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | COMPLAINT |
| Defendants. | ) | |

COMES NOW Plaintiff, Lessie Thomas, as Power of Attorney for Jamil Stafford, by and through her undersigned counsel, complaining of Defendants Garry L. McFadden, Sheriff of Mecklenburg County in his individual and official capacity, Wellpath LLC, Individual Wellpath Providers, Liberty Mutual Insurance Company, and Platte River Insurance Company, hereby alleges and says the following:

## STATEMENT OF THE CASE

Sheriff McFadden held Jamil in custody as a detainee at Mecklenburg County Jail (the "Jail") in the weeks preceding August 3, 2021. Jamil suffered from new persistent, debilitating headaches starting in May through early August. He filed six medical requests from March 29, 2021, to July 4, 2021, begging for help with his headaches. He received little to no assistance from the Jail's healthcare provider, Wellpath LLC ("Wellpath") and its staff. His health issues progressively deteriorated despite repeated requests for help. On July 30, 2021, Jamil exhibited multiple signs of a stroke. The Wellpath providers saw Jamil, in person, and observed his stroke symptoms. Shockingly, none of them properly identified or treated the glaring signs of a stroke which continued and worsened over the next five days. The Sheriff's agents and employees created several written entries about Jamil which clearly demonstrate serious, repeated, worsening stroke symptoms that should have immediately set off alarms that Jamil was experiencing a major health crisis. Despite the Sheriff's officers and staff, including Wellpath's staff, observing his symptoms

firsthand, they all ignored Jamil and dismissed him again and again, ultimately leading to Jamil's near death and permanent and life-altering health conditions.

Justice demands Defendants be held responsible for their choices to ignore Jamil's stroke symptoms and how those choices led to Jamil's entirely preventable permanent injuries, that will completely alter the rest of this young man's life. Jamil deserves to have the truth told about what Defendants did and why they chose to let him suffer and struggle with death for days. No individual should ever again have to suffer this avoidable tragedy. The community expects that a powerful man like Sheriff McFadden will keep people safe, not allow them to suffer obvious stroke symptoms for days on end, until it is far too late to have a meaningful chance at a full recovery.

## PARTIES

1.     Plaintiff Lessie Thomas is an adult, resident of Mecklenburg County, North Carolina, and is under no legal disability. Lessie is Jamil's mother and caregiver. Lessie is the Power of Attorney for Jamil Stafford and has the capacity to bring this action in his name and on his behalf.

2.     Jamil Stafford is a 34-year-old man and resident of Mecklenburg County who has suffered medical disability from the stroke he had on June 30, 2021, that has led to him relying on his mother and appointing her with power of attorney to help manage his affairs, to include with any litigation or legal claims.

3.     At all relevant times, Defendant Sheriff McFadden was a resident of

Mecklenburg County, North Carolina and was the elected Sheriff of Mecklenburg County pursuant to Article VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162-1. His current term ends on December 7, 2026. Plaintiff sues Sheriff McFadden in his individual capacity and official capacity. In 2021, Sheriff McFadden was:

    a. In control of the Jail;

    b. The final decision-making authority over law enforcement policies and officers, deputies, employees, agents at the Jail, and personnel who worked for the Sheriff's Department;

    c. Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents, including all Wellpath employees, providers, and agents who provided treatment and care to detainees at the Jail;

    d. Acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law;

    e. Responsible for the care and custody of the Jail;

    f. Responsible for the care and custody of inmates and detainees in the Jail, including Jamil;

    g. Responsible for administering, managing, and supervising the health care delivery system at the Jail;

    h. The keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55, and he appointed or delegated other keepers of the Jail; and

    i. Vicariously liable for the actions of his agents, employees, officers, deputies, supervisors, managers, jailors, and anyone else who worked in the Jail.

    4. Upon information and belief and at all relevant times, Defendant Wellpath is

a Delaware limited liability company with a principal place of business in Nashville, Tennessee. At all relevant times, Wellpath was responsible for providing medical care to detainees held in Sheriff McFadden's custody at the Jail, including Jamil. Pursuant to contract, Mecklenburg County and the Mecklenburg County Sheriff's Office delegated to Wellpath final policymaking authority over polices, practices, and procedures regarding the provision of medical care to detainees at the Jail. As such, Defendant Wellpath and its employees acted under the color of state law.

5. At all relevant times, Defendant Shelita Jones, LPN/LVN was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

6. At all relevant times, Defendant Jamie Davis, RN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

7. At all relevant times, Defendant Daniel Biondi, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

8. At all relevant times, Defendant Atia Marie Liaghat Nunnally, NP, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

9. At all relevant times, Defendant Falie Louis, RN, was an employee of

Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

10.    At all relevant times, Defendant Stanely Black, RN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

11.    At all relevant times, Defendant Daniela Sanchez was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

12.    At all relevant times, Defendant Roshaunda Friday, RN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

13.    At all relevant times, Defendant Sharelle Williams, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

14.    At all relevant times, Defendant David Owens, LNP, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

15.    At all relevant times, Defendant Annette Black, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

6

16.     At all relevant times, Defendant Alicia Rivers, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

17.     At all relevant times, Defendant Irene Dawson was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

18.     At all relevant times, Defendant Janika Campbell, CNA, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

19.     At all relevant times, Defendant Jennifer Dean, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

20.     At all relevant times, Defendant Jasmine Robinson, MA/LNA, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

21.     At all relevant times, Defendant Linda Valera, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

22.     At all relevant times, Defendant Mary Raudebaugh, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible

for providing constitutional based healthcare to pretrial detainees at the jail.

23.     At all relevant times, Defendant Quashonda Anderson, LPN/LVN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

24.     At all relevant times, Defendant Samuel Mortu, MA/LNA, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

25.     At all relevant times, Defendant Shanta Smith, MA/LNA, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

26.     At all relevant times, Defendant Toshia Sarkor, LPN/LVN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

27.     At all relevant times, Defendant Linda Asbury, RN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

28.     At all relevant times, Defendant Atiya Torrence, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

29.     At all relevant times, Defendant Antoinette Thomas, LPN/LVN, was an

employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

30. At all relevant times, Defendant Destiny Meeks, LPN/LVN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

31. At all relevant times, Defendant David Shkinder, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

32. At all relevant times, Defendant Jakiea Williams, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

33. At all relevant times, Defendant Latisha Henry, LPN/LVN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

34. At all relevant times, Defendant Victoria Cordova, LPN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

35. At all relevant times, Defendant Ester Adedokun, RN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

36.     At all relevant times, Defendant Kendra Brown, LPN/LVN, was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

37.     At all relevant times, Defendant Nurse Thompson was an employee of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

38.     At all relevant times, Defendant Unknown Wellpath Providers were employees of Wellpath, acting under color of state law and an agent of Sheriff McFadden responsible for providing constitutional based healthcare to pretrial detainees at the jail.

39.     Upon information and belief, the Office of the Sheriff, or Mecklenburg County on behalf of the Sheriff, purchased liability insurance or invested to participate in a local municipal government risk pool that provides coverage for claims made by Plaintiff.

40.     Upon information and belief, Wellpath, on its behalf and on the behalf of Sheriff McFadden, purchased insurance that provides coverage for the claims made by Plaintiff.

41.     Upon information and belief, Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a corporation organized and existing under the laws of the State of Massachusetts and is the surety bond holder in contract with the Mecklenburg County Sheriff's Office pursuant to N.C. Gen. Stat. § 58-76-5 and N.C. Gen. Stat. § 162-8. Liberty Mutual, as the surety bond holder for Sheriff McFadden at all times relevant to this

Complaint, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C. Gen. Stat. § 58-76-5.

42.     Upon information and belief, Defendant Platte River Insurance Company ("Platte River") is a corporation organized and existing under the laws of the State of Nebraska and is the surety bond holder in contract with the Mecklenburg County Sheriff's Office pursuant to N.C. Gen. Stat. § 58-76-5 and N.C. Gen. Stat. § 162-8. Platte River, as the surety bond holder for Sheriff McFadden at all times relevant to this Complaint, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C. Gen. Stat. § 58-76-5.

43.     By obtaining coverage via surety bond, liability insurance, or participation in a government risk pool, Sheriff McFadden waived governmental and sovereign immunity on his own behalf and on behalf of his agents acting in their official capacities.

## WAIVER OF IMMUNITY

44.     The allegations in the Paragraphs above are incorporated by reference.

45.     At all relevant times, to the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

46.     Sherrif McFadden is specifically sued in his individual capacity and in his official capacity.

47. Upon information and belief, Liberty Mutual furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and an additional bond covering Sheriff McFadden, Liberty Mutual is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, et seq.

48. Upon information and belief, Platte River furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and an additional bond covering Sheriff McFadden, Platte River is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, et seq.

49. Upon information and belief, the Office of the Sheriff, or Mecklenburg County on behalf of the Sheriff, purchased a liability insurance policy or policies with Safety Specialty Insurance Company that provides coverage for claims made by Plaintiff.

50. Upon information and belief, Sheriff Gary McFadden and Mecklenburg County have an Excess Liability insurance policy with Safety National Insurance Company up to $3,000,000.00 per occurrence, providing coverage for Plaintiff's claims in excess of the self-insured retention and law enforcement liability policy.

51. Upon information and belief, Sheriff Gary McFadden and Mecklenburg County have a Law Enforcement Liability insurance policy with Safety Specialty Insurance Company up to $2,000,000.00 per occurrence, providing coverage for Plaintiff's claims against Defendants.

52. Upon information and belief, Sheriff Gary McFadden and Mecklenburg County are self-insured up to $1,500,000.00.

53.     At all relevant times, Sheriff McFadden, and any and all of his agents, employees, officers, nurses, PAs, jailers, deputies, or other health care providers who worked at the Jail, waived any potential governmental immunity or sovereign immunity defense that could have been raised to the Complaint by virtue of bonds and liability insurance policies to the extent of such bonds or policies.

54.     At all relevant times, Sheriff McFadden, and any and all of his agents, employees, officers, nurses, PAs, jailers, deputies, or other health care providers who worked at the Jail, waived any potential qualified immunity defense.  To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent and grossly negligent violations of Jamil's constitutionally-protected rights while he was in the custody and control of Sheriff McFadden and Wellpath.  There is no question that employees and agents of a Sherriff working at the Jail had to provide a detainee experiencing a medical emergency with appropriate medical treatment and observation.  There is no question that they chose to ignore or willfully violated basic medical training and instructions.  This was in intentional and reckless disregard for Jamil's safety.

55.     To the extent that Sheriff McFadden makes any claim that he is not responsible for the actions of the non-law enforcement Defendant Wellpath because it and its employees were hired under a contract and not as direct employees, this has been waived.  Plaintiff specifically pleads the non-delegable duty owed to an inmate or detainee

13

by a Sheriff, or his employee or all keepers of the Jail as a waiver of such a claim or defense and that Sheriff McFadden is vicariously liable for their actions and that they are acting under color of state law like the rest of Sheriff McFadden's employee or all keepers of the Jail.

56.     In the alternative, at all relevant times, Sheriff McFadden, and any and all agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked for him at the Jail, waived any potential governmental immunity or sovereign immunity defense to the extent that they had any additional bonds or insurance or participated in any local governmental risk pool pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 that might cover any acts or omissions alleged in this Complaint.

57.     Upon information and belief, Wellpath has purchased liability insurance or other insurance or similar devices to provide coverage for its actions in acting as the Sheriff's employee or agent for the provision of health care at the Jail which provides coverage for Plaintiff's claims.

## JURISDICTION AND VENUE

58.     The allegations in the Paragraphs above are incorporated by reference.

59.     All events that form the basis of this Complaint took place in Mecklenburg County, North Carolina which is in the United States District Court for the Western District of North Carolina.

60.     This Court has original jurisdiction over the subject matter and parties of this

action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

61.     This Court has supplemental jurisdiction over any state-law based claims in this action pursuant to 28 U.S.C. § 1367.

62.     This Court has venue in this action pursuant to 28 U.S.C. § 1391.

## FACTS

63.     The allegations in the Paragraphs above are incorporated by reference.

64.     Jamil was born on November 20, 1989.  At the time of his stroke beginning in July 2021, Jamil was only 31 years old.

65.     On March 27, 2021, Mecklenburg police took Jamil into custody and delivered him to the control of the Sheriff at the Jail.  Jamil had not been convicted and was held at the Jail as a pretrial detainee from March to August 2021.

66.     As detailed below, Wellpath and Jail staff ignored Jamil's persistent pleas for help for his serious and worsening medical condition.  Jail and Wellpath staff served as the gatekeepers for other medical personnel capable of treating Jamil's medical condition. While Jamil's condition increasingly worsened, Jail and Wellpath staff delayed and refused to fulfill their critical gatekeeper function and thereby delayed Jamil's ability to access appropriate and necessary medical care.  Rather than taking Jamil's concerns seriously, Wellpath and Jail staff ignored his repeated requests for medical attention.

67.     On May 10, 2021, while still in custody, Jamil submitted a medical sick call request, complaining of a serious persisting headache which made it difficult to eat, sleep,

15

and perform other basic tasks. Defendant Shelita Jones of Wellpath dismissed Jamil's concerns, prescribing him ibuprofen and Zyrtec. This was the first request in a string of persistent headache requests that were not taken seriously by Defendants or their staff.

05/10/2021 10:44 am
ORIGINAL REQUEST:
I HAVE BEEN HAVEN A HEADACHE FOR THE PAST 2 WEEKS I TOOK TYLONAL IBPROFEEN AND NOTHING SEEMS TO WORK PLEASE HELP I CANT SLEEP SOMTIMES EAT MY HEAD HURTS ALL DAY EVERYDAY PLEASE HELP THANKS

68.     Seven days later, on May 17, 2021, Jamil submitted his second medical sick call request. According to the request, he still had an intense headache that was not remedied by the ibuprofen medical staff provided him on May 11. Again, Jamil was seen by Defendant Shelita Jones. She directed Jamil to use new medication, as shown in the records entry below, Jamil also received a ketorolac injection solution for his headache.

Comments: *Will start on Hydrocortisone-Acetic Acid 4 gtts in right ear every 6 hours x5 days, educated on medication use, side effects, duration, and administration. Given 30mg IM Toradol now for pain, Tylenol 650mg PO TID PRN for pain, may use ice or heat packs TID PRN x5 days*

69.     Again, on May 27, 2021, Jamil submitted his third medical sick call request due to his persistent headaches. According to the medical request record, Defendant Shelita Jones advised Jamil to "[i]ncrease water intake" because "dehydration will cause headaches."

**Sick Call Notes**

| Date | Added By | Note |
|---|---|---|
| 05/30/2021 10:41 AM | Shelita Jones | Patient has been on BP checks, which were stable. Patient give no further medical dx. |
| 05/30/2021 10:41 AM | Admin User | You have Ibuprofen available PRN. see med nurse. |
| 05/30/2021 10:41 AM | Admin User | Increase water intake; dehydration will cause headaches. |

70.     A few days later, on June 3, 2021, Jamil continued to beg for help. In his

fourth medical sick call request, he stated that he really needed help, he often could not stand for long amounts of time or breath correctly. Defendant Stanley Black saw Jamil, and merely noted his symptoms. Unable to obtain a urine sample, the Wellpath visit concluded.

06/03/2021  11:48 am
    ORIGINAL REQUEST:
        I REALY NEAD HELP  MY HAD HURT EAVERY DAY ALLDAY ITS FEELS WORST EVERY DAY ITS ALSO FEELS LIKE
        OXYGEN IS NOT GETIN TO MY BRAIN IT ALSO FEEL LIKE FUID IS ON MY BRAIN ALL DAY ALL NIGHT SOMETIMES I
        CANT STAND UP FOR A LONG TIME SOMES I CANT BREATH CORECTLY I REALY NEAD TO GO TO THE HOSPITAL
        MAYBE GET A CAT SKAN SOETHEING IS NOT RIGHT PLEASE GET ME TO THE HOSPITAL IMEADITLY I HAVE KIDS
        IDONT WANT ANY TO HAPPEN TO ME AND EVERYDAY IT FEAL LIKE IS SEROUSLY ABOUT TO PLEASE HELP

71.     On June 16, 2021, Jamil submitted his fifth medical sick call request, again asking for help with his debilitating headaches. Defendant Stanley Black refused to renew Jamil's medication.

72.     On July 4, 2021, Jamil asked to see a nurse and stated for the sixth time in less than two months that his "headaches continue to get worse."

07/04/2021  08:42 am
    ORIGINAL REQUEST:
        I REALY NEED TO SEE THE NURSE MY HEADACHES CONTINUE TO GET WORSE

73.     Again, Jamil is written off by Defendant Shelita Jones. She waited two days to see hom on July 6, 2021. While the records note that a follow-up appointment is scheduled, no appointment occurs for weeks.

**Sick Call Notes**

| Date | Added By | Note |
|---|---|---|
| 07/06/2021 08:58 AM | Shelita Jones | Patient was seen before in sick call with complaints of frequent headaches. He was treated w/ibuprofen and an injection. He stated the injection worked for one day and he still has continuous headaches. Patient stated he also has neck pain and may be contributing to headaches. Patient is not able to sleep at night due to pain. No vision changes or N/V w/Headaches Appointment scheduled for further evaluation. |
| 07/06/2021 08:58 AM | Admin User | You were seen by the medical department in the clinic on 7/6/2021. |

74.     Despite these six serious medical sick call requests, staff never provided Jamil with the proper evaluation or care he needed.  This failure continued eventually directly contributing to his preventable injuries in the weeks to follow.

75.     Finally, on July 27, 2021, Wellpath saw Jamil for his headaches.  According to the medical records, Jamil told staff at Wellpath that he had headaches over four times a week for the last two months.  He rated his pain a 10 on a 1-10 pain scale.  He reported that it hurt so bad, the headaches often wake him up.

76.     Defendants Shelita Jones and Atia Nunnally participated in this appointment. Jamil was diagnosed with "tension-type headaches" with a "low index of suspicion for a secondary cause headache."  Defendant Atia Nunnally advised Jamil to drink more water, use a second blanket for head positioning, and prescribed him nortriptyline and ibuprofen. Yet again, Wellpath was overtly aware of the ongoing medical problems, but they ignored Jamil's progressively worsening symptoms of serious onset of a medical condition and just treated it like no big deal.

1. *Tension-type headaches, intractable*
Degree of Control:                    ○ *Good* ○ *Fair* ◉ *Poor*
COMMENTS:
*Given description and location most likely tension-type headaches. DDx does include migraines and rebound headaches, low index of suspicion for a secondary cause headache. Patient educated on headaches and to increase water consumption. Will order a 2nd blanket that can be used for positioning. Given the severity and duration will start patient on Nortriptyline with goal dose 50mg QHS, can titrate up to 150mg if necessary. Educated on medication use, side effects, duration, and administration. Will also order IBU 600mg PO BID PRN for pain, patient advised to not use more than 3 times in a week. Patient advised to keep a headache diary*

77.     By July 30, 2021, Jamil began experiencing stroke symptoms that were so obvious, other detainees and detention officers recognized them.  According to a detention

officer's report, Jamil could not make it up the stairs by himself. After helping him sit

down, staff gave Jamil water, but he was not able to drink it because of how badly he was

shaking.

07/30/2021 While conducting Breakfast Resident Stafford was coming down the stairs and almost fell a few residents had to catch him. once he was downstairs I allowed him to eat his food in the dayroom. The Resident continued to shake as if he was life less. He was able to eat little but not much. A few Residents assisted him back to his cell (30) were he laid down. Officer D. Mungrow

07/30/2021 Once lockdown was called Resident Stafford was seen headed to his cell (30) to lockdown, but the Resident couldn't make it up the stairs and started staggering another Resident and myself gave Resident Stafford some assistance to have a seat. I fan the Resident to keep him cool and another

Resident gave Resident Stafford some water. I overserved Resident Stafford trying to drink the water, but he was shaking badly. I gave medical a call and nurse Grant informed me that she would be down to check on the Resident. At approximately 2235 Nurse Grant arrived on post to assist with Resident Stafford she checked all his vitals, and she informed me that everything was fine with the Resident and that he may be having anxiety. Resident Stafford was also taken down to medical by Officer D. Prince. Officer D. Mungrow

78.     Once Jamil could stand, detention officers took him to seek medical care

with Wellpath. At this point, Jamil could not speak. Incredibly, the nurse, Defendant

Linda Asbury, dismissed Jamil's symptoms as described by the detention officer. She

stated that there were no abnormal medical findings and implied that Jamil was non-

verbal by choice, rather than suffering from a well-known, basic stroke symptom

impairing his ability to speak. Defendant Linda Asbury referred Jamil out to mental

health, dismissing his overt stroke symptoms as mere anxiety issues. She knew and saw

his symptoms, but she ignored the obvious stroke diagnosis. She should have sent him

for emergency care right then while he was still in both the tPA and thrombectomy

treatment window.

> Added 07/30/2021 02:19 AM EST by LAsbury RN
>
> PT. seen in POD and later brought to Medical Per concerns from the POD CO . whom states he can not walk without shaking. All V/S and BG checked were within normal limits . NON Verbal as PT either would not speak or unable to speak . Pt. sat quietly looking at his hands and appeared to try to avoid eye contact. No abnormal medical findings. Referral to Mental health made D/T possible anxiety issues. PT. brought down in W/C steady gait as he left medical with out any verbal contact.

79.     The next day, on July 31, 2021, Jamil almost fell down the stairs, but luckily a few other residents caught him. Jamil continued his uncontrolled shaking. A detention officer called Defendant Nurse Thompson. Nurse Thompson advised to merely place Jamil on the bottom tier bunk. Jamil barely mumbled that he needed help, but otherwise could not speak coherently. Upon hearing this, the detention officer notified medical that Jamil could no longer speak clearly.

07/31/2021 While conducting dinner Resident Stafford was going up the stairs and almost fell a few residents had to catch him. once he was up the stairs I allowed another resident to assist him. The Resident continued to shake as if he was life less. He was able to eat little but not much. I called the nurse to let them know what happened. They suggested he be moved to the bottom tier. After checking on him, he mumbled that he needed help. I could not understand what he was saying, so I notified medical again to let them know that he could not speak clearly and that I remember him talking before very clearly. Nurse Thompson suggested that I send him down to medical. Officer L. Kelsaw

80.     The Wellpath notes from July 31, 2021, drafted by Defendant Destiny Meeks, do not mention Jamil's speech. The three-sentence entry only states that Jamil came in for a fall, his vitals were within normal limits, and he had no cuts or bruises. The record demonstrates that Defendant Meeks and other Wellpath staff ignored the obvious stroke symptoms and failed to evaluate Jamil for any issues with his speech or ability to walk: such obvious stroke symptoms that they are included on the basic "FAST" acronym

widely known by even non-healthcare providers (F: facial drooping, A: arm weakness, S: speech difficulty, T: time to call emergency services). Even the detention officers knew, or strongly suspected, that Jamil was actively experiencing an ongoing medical emergency. The record also fails to consider that Jamil fell the day prior, indicating a clear pattern of new and serious issues. Treating an obvious stroke victim as if it was simple fall case defies common sense, for a lay person, and is unconscionable for a trained medical professional.

> *Added 07/31/2021 08:08 PM EST by DMeeks LPN/LVN*
>
> *Resident came down to the clinic for a fall. Vitals were taken and within normal limits. There were no cuts or bruises present any where on resident body.*

81.    On August 1, 2021, Jamil fell down the stairs. A detention officer sent him to medical. Shockingly, Wellpath did not even bother to conduct an intake examination or make any written entry at all. Instead, they sent him back to his bunk for the detention officers to monitor him for the rest of the night without ever creating a medical record.

08/01/2021 When I came on post today I was informed that Resident Stafford had fell down the stairs, After shift change i sent resident down to medical at approximately 8006 hours to be seen. They sent the resident back will monitor throughout the night. Officer M. Robertson-Bye

82.    On August 2, 2021, according to their records, the detention officers were concerned about Jamil's health. For example, one officer called to check in on him because she witnessed him stumbling and staggering earlier in the day. The records note that while Jamil was able to give physical responses at this point, he could not give a verbal response, he could only mumble incoherently.

08/02/2021 Officer Stuppard called Pod 1800 say she wanted to check on Resident Stafford because she said the last time she was in the POD he was stumbling and staggering, and she wanted to check on him. I told he that he was responsive physically but not verbally. Officer L. Kelsaw

08/02/2021 Officer Murphy from front lobby called to POD 1800 to ask about Resident Stafford. He said that his mother was here asking questions about his well-being. I told him that I just had checked on resident Stafford and that I would do it again while he was on the phone. I went and opened his door and asked if he was okay and Officer Murphy could hear him mumble because he cannot talk literally. Officer L. Kelsaw

83.    Even after detention officers informed Wellpath staff about these symptoms on August 2, 2021, Defendant Quashonda Anderson merely offered Jamil more nortriptyline. Ignoring easily observed basic stroke symptoms for the fourth day in a row defies every concept of constitutionally adequate healthcare.

84.    Wellpath and its providers had a duty to avoid all of this time Jamil spent suffering from an active, ongoing stroke for four days at this point, but they simply ignored him and sent him back to his cell to further deteriorate.

85.    On August 3, 2021, residents in Jamil's pod informed a detention officer that Jamil fell earlier in the day, he could no longer speak, and he could not move his arm. The detention officer confirmed that he could not understand a thing Jamil said. At the same time, Jamil clenched his right hand and could not open it. The sergeant told the detention officer to call mental health to check on Jamil. This had nothing to do with a mental health provider, but the other Wellpath staff simply ignored the obvious problem for four days. When the mental health provider heard about Jamil's condition, she immediately directed the detention officer to call medical.

08/03/2021 While providing a break to Officer El  The residents in POD 1800 informed me that Resident
Stafford was no longer able to speak and that he could not lift his arm, and that he did fall earlier that
morning while out in the dayroom and asked me if I could go in and check on him. I did go to his cell to
check on him. I asked him several questions and he was unable to speak clearly. I could not understand
anything that he said. His right hand was clenched and did not look like he was able to open it up. I
called Sergeant Sims to inform him about this Residents medical condition and he directed me to call
Mental Health. Mental Health called Medical, and Medical called me to gather more information about
Resident Stafford, then directed me to bring him up to the Clinic. Officer T Y Webb

86.     On this same day, Jamil, being physically held up by inmate, because he
could not talk or walk on his own, participated in a video call with his mom.  She watched
in horror as he appeared to have had a stroke.  She advised him to request immediate
medical attention.

87.     Later, the detention officers took Jamil to medical.  Upon arriving at medical,
Defendant Roshaunda Friday noted that Jamil's speech was unintelligible, his right arm
was drooping, as was the right side of his face.  Finally, five days after his first presentation
with obvious stroke symptoms, Defendant David Owens activated EMS to transport Jamil
to the hospital for a possible stroke.

88.     The ambulance delivered Jamil at Carolinas Medical Center on the afternoon
of August 3, 2021.

89.     At the hospital, doctors diagnosed Jamil with a stroke due to a large left MCA
infarct.

90.     Hospital staff note in the medical records on multiple occasions that Jamil's
stroke symptoms, such as falling, occurred days before his admittance to the hospital.

91.     The length of time that Jamil suffered with stroke symptoms severely limited

his treatment at the hospital. He lost the opportunity to review certain beneficial medications and treatments that could have improved his chances of recovery, including tPA and a thrombectomy. Both tPA and a thrombectomy can significantly reduce the severity of the disability and damage to the brain that a stroke can cause possibly eliminating any permanent damage.

92.     The benefits of tPA and a thrombectomy are time dependent, and treatment for patients must be initiated as quickly as possible, within 4.5 hours for the tPA and 24 hours for a thrombectomy. Wellpath's actions ignoring Jamil for five days sealed his fate by removing any chance for those treatments he was otherwise eligible for.

| History and Physical Reports |
|---|

Patient seen and examined, reviewed assessment and plan

31-year-old male who was incarcerated and initially presented with imbalance that has apparently been going on for about 2 days. On my exam he is clearly dysarthric with expressive aphasia. Appears weak most notably in his right upper extremity/right hand.

–Patient with large left MCA stroke but not a candidate for TPA or thrombectomy given lack of perfusion mismatch and timeframe from initial symptoms
–Plan to monitor in ICU, if deteriorating neuro status will obtain repeat imaging and consider neurosurgical consultation due to concern for cerebral edema

93.     Four days later, while still in the hospital, on August 7, 2024, Jamil could only communicate via nodding or shaking his head. Doctor's notes state that he was "essentially nonverbal with garbled speech."

**Review of Systems**
Unable to obtain history from patient other than nodding yes no. He is essentially nonverbal with garbled speech. He notes improvement in headache. He denies oral lesions, swollen lymph nodes, chest or abdominal pain. He denies any skin lesions.

24

94.     Due to the extent of his injuries, Jamil remained hospitalized for 18 days, until doctors discharged him on August 20th, 2021.

95.     During his time in the hospital, Sheriff McFadden released Jamil from Jail.

96.     In addition to the terror and anguish he suffered for those months that Wellpath ignored him, Jamil had a long, difficult recovery.  Jamil continues to struggle as a result of his stroke.  He still has significant weakness on his right side.  His use of his right hand is limited; he is not able to hold things or use it effectively.  He is right-handed, so this weakness limits him on a daily basis in performing activities of daily life.  Standing for a long period of time is no longer possible for Jamil.  He also has a serious speech impediment and memory loss that he did not have before the stroke.  He will continue to suffer from these problems for the rest of his life and faces worsening deterioration as he ages.

97.     The constitutionally inadequate and exceedingly delayed medical care that Jamil experienced while under the care of Wellpath was not an isolated incident.  Wellpath and its predecessor companies have a well-documented history of cutting costs at the expense of prisoners' health, safety, and well-being.  Wellpath and its predecessors have faced thousands of lawsuits in cases alleging deficient medical care.

98.     In fact, in the same month, August 2021, the DOJ issued an exhaustive and damning report concluding that another Wellpath detention facility serviced was violating the constitutional and statutory rights of prisoners by failing to provide constitutionally

adequate medical care.[1]  The report states that in reviewing medical request forms, "medical staff frequently overlook prisoner's concerns, fail to provide prompt care, or fail to provide care at all."  Further, the DOJ Report concluded that "Wellpath and its staff appear not to take seriously prisoner grievances or the grievance process as a mechanism for prisoners to raise legitimate medical concerns." This was exactly the same thing Wellpath did to Jamil at the Mecklenburg Jail.

99.    Similarly, CNN reported on Wellpath's deficiencies and negligence in 2019, stating that "[a]cross the county the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases."[2]

100.   The report went on: "Employees at three facilities told CNN that workers shredded medical requests or hid them in boxes because of a lack of staff and resources. In other places, documents and interviews recount how requests had been found stuffed in drawers or ignored for weeks.  A review of lawsuits filed over the last five years found the company has been sued for more than 70 deaths.  In other lawsuits over that time period, inmates have alleged prolonged suffering, ongoing complications, shortened life expectancy and debt . . . . Doctors who examined records from around a dozen deaths and other incidents for CNN said they believed that in the majority of cases they reviewed, serious outcomes could have been avoided . . . had [Wellpath] provided proper care."

---

[1] Investigation of the San Luis Obispo County Jail (Dep't of Justice Aug. 31, 2021), https://www.justice.gov/crt/case-document/file/1429036/dl.
[2] Blake Ellis and Melanie Hicken, *PLEASE HELP ME before it's too late*, CNN (June 25, 2019) https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

Jamil's serious outcome could have been avoided, or at least minimized if Wellpath had bothered to pay attention to him for months, and then especially for the five days they saw and ignored him suffering an active stroke.

101.   Wellpath also has a well-publicized history of ignoring complaints of headaches from prisoners with serious conditions, like Jamil.  For example, in 2016, Michael Ramey, a 36-year-old man confined in a Massachusetts county jail, complained to medical staff of severe headaches, saying he felt as though his head "was about to explode."  Like with Jamil, Wellpath ignored Mr. Ramey's concerns for weeks.  Mr. Ramey's medical records stated: "He was repeatedly shouting, 'What, I can't hear you.  I can't hear or see anything . . . I need help, something is wrong.'"  Ultimately, doctors diagnosed Mr. Ramey with cryptococcal meningitis, and he died of his illness 65 days after he initially reported his symptoms to medical staff at the jail.[3]  In 2020, a woman, Tiffany Davis, died of meningitis at a Michigan jail where Wellpath provided medical care.  Ms. Davis begged nursing staff to send her to the hospital, for symptoms that started with headaches and progressed to nausea and seizures. After inexplicable delay, Wellpath finally authorized sending her to the hospital.  When she arrived, doctors pronounced her

---

[3] Christine Willmsen and Beth Healey, *When Inmates Die of Poor Medical Care, Jails Often Keep It Secret*, wbur (Mar. 30, 2020), https://www.wbur.org/news/2020/03/23/county-jail-deaths-sheriffs-watch.

brain dead. An autopsy reported that Ms. Davis died of multiple brain hemorrhages caused by meningitis.[4]

102.    Wellpath faces a similar suit with a detainee who suffered terrible outcome because Wellpath ignored his head trauma and pain in Rowan County.

103.    Indeed, just as the reports, lawsuits, and news stories demonstrate the pattern all over North Carolina and the United States of America, as result of Wellpath's failures, Jamil suffered ongoing brain trauma from undiagnosed disease for months, and he suffered an active ongoing stroke for five days, increasingly worsening, which ultimately led to preventable, and totally unnecessary injuries, as a direct result of him being in the sole custody and control of the Sheriff and at the mercy of Wellpath's medical care.

104.    Defendants' actions, individually and combined, directly led to and caused Jamil's suffering and permanent injuries.

105.    Defendants' actions violated Jamil's clearly established and well-settled fundamental rights under the United States Constitution, including the following: the right to be free from cruel or unusual punishment, the right to adequate, necessary and emergency medical care while in custody, the right to substantive due process under the Fourteenth Amendment, and other inalienable rights retained by him as a citizen regardless of his circumstances in custody.

## **CAUSES OF ACTION**

---

[4] Ken Kolker, *Family sues Muskegon County over inmate death*, WoodTV (Feb. 17, 2022), https://www.woodtv.com/news/target-8/family-sues-muskegon-county-over-inmate-death/.

**COUNT ONE: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 BY WELLPATH and its EMPLOYEES and AGENTS SHELITA JONES, LPN/LVN; JAMIE DAVIS, RN; DANIEL BIONDI; ATIA MARIE LIAGHAT NUNNALLY, NP; FALIE LOUIS, RN; STANLEY BLACK, RN; DANIELA SANCHEZ; ROSHAUNDA FRIDAY, RN; SHARELLE WILLIAMS; DAVID OWENS, LNP; ANNETTE BLACK; ALICIA RIVERS, LPN; IRENE DAWSON; JANIKA CAMPBELL, CNA; JENNIFER DEAN, LPN; JASMINE ROBINSON, MA/LNA; LINDA VALERA, LPN; MARY RAUDEBAUGH, LPN; QUASHONDA ANDERSON, LPN/LVN; SAMUEL MORTU, MA/LNA; SHANTA SMITH, MA/LNA; TOSHIA SARKOR, LPN/LVN; LINDA ASBURY, RN; ATIYA TORRENCE, LPN; ANTOINETTE THOMAS, LPN/LVN; DESTINY MEEKS, LPN/LVN; DAVID SHKINDER, LPN; JAKIEA WILLIAMS, LPN; LATISHA HENRY, LPN/LVN; VICTORIA CORDOVA, LPN; ESTER ADEDOKUN, RN; KENDRA BROWN, LPN/LVN; NURSE THOMPSON; AND UNKNOWN WELLPATH PROVIDERS (in their official and individual capacities)**

106.    The allegations in the Paragraphs above are incorporated by reference.

107.    In the manner described more fully above, Wellpath's and its employees' actions, customs and policies constituted deliberate indifference to Jamil's serious medical needs. These were violations of Jamil's rights under at least the Eighth and Fourteenth Amendments to the United States Constitution, and the injures that he suffered and continues to suffer as a result, were proximately caused by the policies and practices of Wellpath and its employees.

108.    Upon information and belief, at all times relevant to the events at issue in this case, Wellpath contracted with the Mecklenburg County Sheriff's Office to provide healthcare to individuals in custody at the Jail, including Jamil. As more fully described above, pursuant to the contract, the Mecklenburg County Sheriff's Department delegated

to—and Wellpath was responsible for—final policymaking authority over the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to individuals in custody of the Mecklenburg County Sheriff's Department. Notwithstanding this delegation, the Mecklenburg County Sheriff's Department, and thus Sheriff McFadden, maintained a continuing obligation to ensure the provision of adequate medical care under the Eight and Fourteenth Amendments.

109. As a direct and proximate result of the violations of the policies, practices, and customs, Wellpath and Defendants Jones, Davis, Biondi, Nunnally, Louis, Black, Sanchez, Friday, Williams, Owens, Black, Rivers, Dawson, Campbell, Dean, Robinson, Valera, Raudebaugh, Anderson, Mortu, Smith, Sarkor, Asbury, Torrence, Thomas, Meeks, Shkinder, Williams, Henry, Cordova, Adedokun, Brown, Thomspon, and Unknown Wellpath Providers were acting under color of state law and denied Jamil his rights under the United States Constitution including at least rights secured by the Eighth and Fourteenth Amendments, and other federal laws. They also violated his rights or stood idly by as they knew or should have known other state actions violated his rights, thus making them liable for bystander and supervision liability.

110. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable sheriff, officer, agent, medical care provider, or employee would have known. It is not possible, given the normal

expectations of jailers and medical care providers in general, that any of the Defendants named above can claim that they were unaware of what should have happened to avoid violating Jamil's constitutionally protected rights in this situation.

111.    As a direct and proximate result of the deprivation of Jamil's constitutional and federal rights as alleged herein, Jamil suffered preventable, and totally unnecessary significant permanent injuries while in the custody of the Jail and totally unable to fend for himself.  Jamil's permanent injuries would not exist at all, or be as severe, if not for the detention officers, medical care providers, supervisors, agents, or employees, specifically the Defendants named above, who worked at the Jail's failure to adequately treat Jamil for months and then especially for five days as he exhibited obvious stroke symptoms.  This delay in treatment caused Jamil to not receive beneficial medication and treatments as described above.  Consequently, Lessie, on behalf of Jamil, is entitled to recover from Defendants, in their individual capacity, compensatory damages in an amount in excess of $75,000.00.

## COUNT TWO: VIOLATIONS OF FEDERAL CIVIL RIGHTS LAWS 42 U.S.C. § 1983 and 1988 BY SHERIFF MCFADDEN (in his official and individual capacity)

112.    The allegations in the Paragraphs above are incorporated by reference.

113.    At all relevant times, Sheriff McFadden was responsible for the formulation and execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Jail.

31

114. At all relevant times, Sheriff McFadden was responsible for the formulation and execution of policies regarding the medical care provided to inmates and detainees at the Jail.

115. Upon information and belief and at all relevant times, Sheriff McFadden was acting under color of state law, had in effect de facto policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or medical care providers who worked at the Jail, as alleged above, including, *inter alia*:

     a.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating stroke risk in inmates and detainees;

     b.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for assisting and treating stroke risk in inmates and detainees;

     c.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for evaluating serious medical conditions in inmates and detainees;

     d.    The failure to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Jail in the proper methods or policies for assisting and treating inmates and detainees with serious medical conditions;

     e.    The failure to ensure that proper methods or policies were being employed by detention officers or medical care providers assigned to the Jail to evaluate the conditions of inmates and detainees in the Jail;

f.  The failure to ensure that proper methods or policies were being employed by detention officers or medical care providers assigned to the Jail to assist and treat inmates and detainees in the Jail with serious medical conditions;

g.  The failure to draft or institute proper or appropriate policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

h.  The failure to ensure that detention officers or medical care providers assigned to the Jail were trained or familiar with proper policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

i.  The failure to ensure that detention officers or medical care providers assigned to the Jail complied with proper policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

j.  The failure to ensure that detention officers or medical care providers who worked at the Jail complied with existing policies and procedures;

k.  The failure to ensure that detention officers or medical care providers who worked at the Jail complied with applicable statutes and administrative codes;

l.  The failure to ensure that detention officers or medical care providers who worked at the Jail were not assigned other duties that would interfere with the appropriate supervision, custody, or control of inmates and detainees; and

m.  Other policies, customs, and practices to be identified during

the course of discovery or trial.

116.    Upon information and belief, Sheriff McFadden had actual or constructive knowledge that the detention officers, medical care providers, supervisors, agents, or employees who worked at the Jail were, and had been prior to August 2021, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Jamil.

117.    In the manner described more fully above, Sheriff McFadden and the detention officers, medical care providers, supervisors, agents, or employees who worked at the Jail knew of and ignored Jamil's obvious and serious medical needs, failed to sufficiently evaluate Jamil to make an informed judgment about or properly diagnose his condition, delayed necessary medical treatment, and provided grossly inadequate medical care. This amounted to deliberate indifference of Jamil's known serious medical conditions that led to his harm and permanent damages.

118.    As described above, upon information and belief, the Mecklenburg County Sheriff's Office contracted with Wellpath to provide medical services at the Jail.  This agreement purportedly delegated to Wellpath the final policymaking authority over the creation, implementation, oversight and supervision of polices, practices, and procedures regarding the provision of medical care to individuals in custody of the Mecklenburg County Sheriff's Department. However, notwithstanding this delegation, the Mecklenburg County Sheriff's Department, and thus Sheriff McFadden, maintained a continuing

constitutional obligation to ensure the provision of adequate medical care.

119.   Sheriff McFadden violated Jamil's constitutional rights by failing to properly supervise the Wellpath agents under his control for the non-delegable duty to provide constitutionally adequate healthcare.  He also violated Jamil's constitutional rights because he knew or should have known about the actions of Wellpath and its agents violating Jamil's constitutional rights in bystander liability.

120.   As a direct and proximate result of the violations of the policies, practices, and customs, Jamil's rights under the United States Constitution, including at least rights secured by the Eighth and Fourteenth Amendments, and under other federal laws were violated.

121.   The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable sheriff, officer, agent, medical care provider, or employee would have known.  It is not possible, given the normal expectations of jailers in general, that Sherrif McFadden can claim that he was unaware of what should have happened to avoid violating Jamil's constitutionally protected rights in this situation.  As a result, the defense of qualified immunity is unavailable to, and has been waived, by Sheriff McFadden.

122.   As a direct and proximate result of the deprivation of Jamil's constitutional and federal rights as alleged herein, Jamil suffered preventable, and totally unnecessary

significant permanent injuries while in the custody of the Jail and totally unable to fend for himself. Jamil's permanent injuries would not exist at all, or be as severe, if not for the detention officers, medical care providers, supervisors, agents, or employees who worked at the Jail's failure to adequately treat Jamil for months and then especially for five days as he exhibited obvious stroke symptoms. This delay in treatment caused Jamil to not receive beneficial medication and treatments as described above. Consequently, Lessie, on behalf of Jamil, is entitled to recover from Sherriff McFadden, in his individual capacity and official capacity, compensatory damages in an amount in excess of $75,000.00.

### COUNT THREE: MEDICAL MALPRACTICE AND MEDICAL GROSS NEGLIGENCE BY SHERIFF MCFADDEN and WELLPATH

123.    The allegations in the Paragraphs above are incorporated by reference.

124.    At all times relevant hereto, Wellpath's employees and agents acted within the course and scope of their agency and employment with Wellpath, making Wellpath liable for any negligent acts by these employees pursuant to the doctrine of *respondeat superior*.

125.    At all times relevant hereto, Sheriff McFadden's employees and agents acted within the course and scope of their agency and employment with Sheriff McFadden, making Sheriff McFadden liable for any negligent acts by these employees pursuant to the doctrine of *respondeat superior*.

126.    The treatment provided to Jamil by Wellpath and its employees and agents fell below the accepted standards of practice, care, skill, and diligence for Mecklenburg

County, North Carolina and similar communities in 2021, was negligent, and amounted to malpractice.

127. At all times relevant to the Complaint, Wellpath expressly and implicitly represented to the public, including Jamil, that they furnished health care services in a skilled and proper manner and that they were properly trained, highly skilled, closely supervised, and fully capable of performing all medical skills in a skilled and proper manner in accordance with the standards of practice among members of the same healthcare profession, with similar training and experience situation in the same or similar communities at the time of the treatment rendered to Jamil.

128. In the manner described more fully above, the Sheriff, Wellpath and its employees and agents breached the duty of care owed to detainees in their care. Wellpath owed a duty to Jamil to provide him with needed healthcare while he was incarcerated at the Jail. Wellpath and its employees were negligent, grossly negligent, or acted in reckless disregard of Jamil's rights in that they individually and/or collectively:

     a. failed to ensure that Jamil had access to appropriate and timely health care to meet his serious health needs;

     b. failed to take Jamil's complaints about his significant medical needs seriously for months, despite his continued pleas for help with his debilitating headaches;

     c. failed to perform MRI, CT, or other radiographic imaging or other scans on Jamil despite his complaints of persistent headaches and other symptoms for months, and especially during the last five days starting July 30 when he displayed obvious stroke symptoms;

> d. failed to take Jamil's complaints or detention officers' reports about Jamil's significant medical needs seriously for months and especially for last five days starting July 30 despite his clear and documented signs of a stroke;
>
> e. failed to timely and adequately engage and provide emergency medical care; and
>
> f. failed to adequately care for Jamil in additional ways which will be discovered before or during trial.

129.    Alternatively, the Sheriff, Wellpath, and its employees and agents were grossly negligent or willful and wanton in committing the misconduct described above in that they demonstrated an utter indifference to the health or safety of others. Wellpath and its employees and agents were aware that an injury would probably result from the above-described course of action and inaction and recklessly disregarded the consequences of those actions and inactions.

130.    The Sheriff, Wellpath, and its employees and agents' actions and inactions were undertaken with gross negligence or willfully and wantonly or with reckless indifference or conscious disregard for Jamil's health or safety.

131.    As a direct and proximate result of the Sheriff's, Wellpath's, and its employees and agents' misconduct, Jamil suffered injuries, and continues to suffer injuries, including weakness of his right side and limited use of his right and dominant hand, the inability to stand for long periods of time, speech slurring, and memory loss.

132.    Sheriff McFadden is responsible for this medical claim through *respondeat superior* because he hired Wellpath to perform this non delegable duty.

## COUNT FOUR: NEGLIGENT HIRING, RETENTION, and SUPERVISION
## (BY SHERIFF MCFADDEN and WELLPATH)

133.    The allegations in the Paragraphs above are incorporated by reference.

134.    At all times relevant hereto, Sheriff McFadden and his employees and agents acted within the course and scope of his agency and employment with the Jail, making Sheriff McFadden liable for any negligent acts by these employees pursuant to the doctrine of *respondeat superior*.

135.    At all times relevant hereto, Wellpath's employees and agents acted within the course and scope of their agency and employment with Wellpath, making Wellpath liable for any negligent acts by these employees pursuant to the doctrine of *respondeat superior*.

136.    In the manner described more fully above, Sherrif McFadden and his employees and agents breached the duty of care owed to Jamil, a detainee in his care. Sherrif McFadden owed a duty to Jamil to provide him with the needed healthcare while he was incarcerated at the Jail.  Sheriff McFadden and Wellpath negligently breached that duty in one or more of the following ways:

  a.  deciding to contract with Wellpath to provide medical services at the Jail despite Wellpath's extensive well-documented, and expressly acknowledged track record of providing grossly deficient, negligent, and unconstitutional medical care to people in detention facilities in North Carolina and across the United States;

  b.  delegating to Wellpath control and authority over medical services at the jail despite Wellpath's extensive well-documented, and expressly acknowledged track record of providing grossly deficient, negligent,

39

and unconstitutional medical care to people in detention facilities in North Carolina and across the United States;

c.  failing to monitor Wellpath's healthcare services despite Wellpath's extensive, well-documented, and expressly acknowledged track record of providing grossly deficient medical care to people in detention facilities in North Carolina and across the United States;

d.  failing to monitor the contractual obligations imposed on Wellpath;

e.  after entering the contract, failing to review Wellpath's policies and procedures that Wellpath put into practice;

f.  after entering the contract, failing to put in place policies and systems designed to ensure that Wellpath would fulfill its obligations to provide constitutionally adequate medical care to people in the custody of the Jail;

g.  failing to ensure Wellpath providers provided emergency medical care;

h.  failing to ensure Wellpath providers contacted a physician and relayed Jamil's symptoms;

i.  failing to ensure Wellpath providers took Jamil's complaints about his significant headaches seriously for months, despite his continued pleas for help;

j.  failing to ensure Wellpath took Jamil's overtly observed and known stroke symptoms seriously for days, despite several clear symptoms and rapid physical and mental deterioration.

k.  failing hiring and retaining medical care providers who were either so inept that they failed to recognize the obvious and well-known stroke symptoms for several days or were so indifferent to Jamil's overt life-threatening condition that they could not be bothered to do their simple job of sending him to receive emergency medical care for several days.

137.  Alternatively, Wellpath, Sheriff McFadden, and their employees and agents were grossly negligent or willful and wanton in committing the misconduct described

above in that they demonstrated an utter indifference to the health or safety of others. Wellpath, Sherriff McFadden, and their employees and agents were aware that an injury would probably result from the above-described court of action and inaction and recklessly disregarded the consequences of those actions and inactions.

138.    Sherrif McFadden and his employees and agents' actions and inactions with regard to the hiring, retention, and supervision of Wellpath providers at the Jail, including those by Wellpath, were undertaken with gross negligence or willfully and wantonly or with reckless indifference or conscious disregard for Jamil's health or safety.

139.    As a direct and proximate result of Wellpath's, Sherriff McFadden's, and their employees and agents' misconduct, Jamil suffered injuries, and continues to suffer injuries, including weakness of his right side and limited use of his right and dominant hand, the inability to stand for long periods of time, speech slurring, and memory loss.

**COUNT FIVE: VIOLATION OF N.C. Gen. Stat. § 162-55 -**
**SHERIFF MCFADDEN, WELLPATH, and SHELITA JONES, LPN/LVN; JAMIE**
**DAVIS, RN; DANIEL BIONDI; ATIA MARIE LIAGHAT NUNNALLY, NP;**
**FALIE LOUIS, RN; STANLEY BLACK, RN; DANIELA SANCHEZ;**
**ROSHAUNDA FRIDAY, RN; SHARELLE WILLIAMS; DAVID OWENS, LNP;**
**ANNETTE BLACK; ALICIA RIVERS, LPN; IRENE DAWSON; JANIKA**
**CAMPBELL, CAN; JENNIFER DEAN, LPN; JASMINE ROBINSON, MA/LNA;**
**LINDA VALERA, LPN; MARY RAUDEBAUGH, LPN; QUASHONDA**
**ANDERSON, LPN/LVN; SAMUEL MORTU, MA/LNA; SHANTA SMITH,**
**MA/LNA;TOSHIA SARKOR, LPN/LVN; LINDA ASBURY, RN; ATIYA**
**TORRENCE, LPN; ANTOINETTE THOMAS, LPN/LVN; DESTINY MEEKS,**
**LPN/LVN; DAVID SHKINDER, LPN; JAKIEA WILLIAMS, LPN; LATISHA**
**HENRY, LPN/LVN; VICTORIA CORDOVA, LPN; ESTER ADEDOKUN, RN;**
**KENDRA BROWN, LPN/LVN; NURSE THOMPSON; AND UNKNOWN**
**WELLPATH PROVIDERS**

41

140.    The allegations in the Paragraphs above are incorporated by reference.

141.    At all times relevant to this Complaint, Jamil was committed to the custody and care of Sheriff McFadden, and the other detention staff and medical providers who worked at the Jail from March 22, 2021, to August 3, 2021.

142.    Sherrif McFadden was a keeper of the Jail pursuant to N.C. Gen. Stat. § 162-55.  He delegated that authority as a keeper of the Jail to Wellpath and Defendants Jones, Davis, Biondi, Nunnally, Louis, Black, Sanchez, Friday, Williams, Owens, Black, Rivers, Dawson, Campbell, Dean, Robinson, Valera, Raudebaugh, Anderson, Mortu, Smith, Sarkor, Asbury, Torrence, Thomas, Meeks, Shkinder, Williams, Henry, Cordova, Adedokun, Brown, Thompson, and Unknown Wellpath Providers as it related to their provision of constitutionally adequate healthcare to Jamil.  So, for purposes of N.C. Gen. Stat. §162-55, they were all subject to liability for their negligent and grossly negligent actions and inactions in providing medical care to Jamil.

143.    The conduct of Sherrif McFadden and his agents and employees, with regard to the lack of attention, negligence and gross negligence related to Jamil, as alleged above, was so careless, wanton, and reckless that it demonstrated a thoughtless disregard of consequences and a heedless indifference to his safety and rights.

144.    The conduct of these Defendants, as alleged above, was a proximate cause of Jamil's permanent and significant injuries and constituted a wrong or injury to Jamil pursuant to N.C. Gen. Stat. § 162.55.

145.     Sheriff McFadden is liable for the conduct of the other detention staff and medical providers who worked at the Jail from March 27, 2021, to August 3, 2021, as alleged above, in his supervisory capacity.  As such, all of the conduct described above is imputed to Sheriff McFadden.  This occurs by way of the doctrines of agency, vicarious liability, and *respondeat superior*.

146.     As a direct and proximate result of the conduct of these Defendants, as alleged above, Jamil suffered for months from new, severe, painful, brain disease and for five days from an ongoing stroke with obvious symptoms which were, painful, terrifying, preventable, and curable if treated in a timely manner.  Consequently, Lessie, on behalf of Jamil, is entitled to recover from each of these Defendants, in their individual and official capacities, compensatory damages in an amount in excess of $75,000.00 pursuant to N.C. Gen. Stat. § 162-55.

147.     Furthermore, Lessie, on behalf of Jamil, is entitled to recover treble damages as set out in N.C. Gen. Stat. § 162-55.

### COUNT SIX: ACTION ON BONDS and N.C. Gen. Stat. § 58-76-1, *et sequ*. – SHERIFF MCFADDEN, LIBERTY MUTUAL, and PLATT RIVER

148.     The allegations in the Paragraphs above are incorporated by reference.

149.     As alleged herein, Sheriff McFadden neglected the duties of his office and committed wrongful acts as Sheriff and of Mecklenburg County.

150.     Jamil was seriously and permanently injured as a proximate result of Sheriff McFadden's neglect and wrongful acts in office.  Consequently, Lessie, on behalf of Jamil,

is entitled to recover from Sheriff McFadden's surety, Liberty Mutual Insurance Company and Platte River Insurance Company, damages in excess of $75,000.00.

## **COUNT SEVEN: PUNITIVE DAMAGES – ALL DEFENDANTS**

151.    The allegations in the Paragraphs above are incorporated by reference.

152.    The actions and inactions of Defendants were undertaken by them intentionally, willfully, wantonly, or in reckless disregard to the rights and safety of Jamil.

153.    Defendants participated in or were aware of and condoned the aggravating conduct described herein; or, knew or should have known that no systems, procedures or protocols were in place to prevent the aggravating conduct described herein, and thus participated in or condoned the relevant conduct.

154.    Further, Defendants, including their agents and employees, were aware of the impropriety and illegality of their actions, and knew their actions and inactions were wrong; or, in the exercise of reasonable diligence should have realized they were acting improperly before August 3, 2021. Despite this knowledge, they made an inadequate effort to provide medical care or treatment to Jamil.

155.    The conduct of Defendants, as alleged herein constitutes egregious, reckless, malicious, and willful and wanton conduct as more particularly defined by the provisions of N.C. Gen. Stat. §1D-1 et seq. and under federal common law.

156.    As a direct and proximate result of said conduct, Jamil was injured, and consequently, Lessie, on behalf of Jamil, is entitled to have and recover punitive damages

from Defendants in an amount in excess of $75,000.00.

## DAMAGES

157.    The allegations in the Paragraphs above are incorporated by reference.

158.    As a direct and proximate result of these wrongful and negligent actions by Defendants, Jamil suffered for months with untreated serious medical condition that progressed and deteriorated until, for the last five days, he suffered an ongoing stroke which caused him a great deal of pain, terror, and suffering, and ultimately permanent injuries.  Jamil had to stay in the hospital for 18 days following his admittance and could not talk until he eventually relearned some ability to speak, although it remains diminished.

159.    As a direct and proximate result of these wrongful and negligent actions by Defendants, now, almost three years later, Jamil still suffers the consequences from Defendants' wrongful, negligent, grossly negligent, and reckless actions.  Jamil suffers permanent severe speech impediment, memory loss, and impairment on the right side of his body.  Given that Jamil is right-handed, he has significant trouble using his right hand to perform activities of daily living, and he can no longer stand for long periods of time.

160.    Lessie, on behalf of Jamil, is entitled to recover from Defendants, jointly and severally, treble damages pursuant to N.C. Gen. Stat. § 162-55.

161.    By reason of the grossly negligent, reckless, malicious, needless, willful and wanton conduct of Defendants, as alleged above, as well as Defendants' conscious disregard for the safety of Jamil, Lessie, on behalf of Jamil, is entitled to receive punitive

damages under both the state and federal law in an amount to be determined at trial in excess of $75,000.00 to punish Defendants for their illegal, unconstitutional, unlawful, egregiously wrongful, reckless, willful and wanton misconduct and to deter such conduct by others in the future.

## COMPLIANCE WITH RULE 9(j) of the NORTH CAROLINA RULES OF CIVIL PROCEDURE

162.    The allegations in the Paragraphs above are incorporated by reference.

163.    Lessie submits that Rule 9(j) of the North Carolina Rules of Civil Procedure should not apply in this federal court action.

164.    Lessie submits that if Rule 9(j) of the North Carolina Rules of Civil Procedure is applicable at all, then it is unconstitutional under both the state and federal constitutions and violates, among other things, Jamil's equal protection rights, due process rights, his right to equal and open access to the courts, and the right to a jury trial as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, and 25 and Article IV, Sections 1 and 13 of the North Carolina Constitution. However, without waiving this objection and out of an abundance of caution, Lessie states that medical health providers who Lessie reasonably believes will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence reviewed all of the allegations of negligence related to medical care that is described in this Complaint and all the medical records pertaining to the alleged negligence that are available to Lessie after a reasonable inquiry.  These experts are willing to testify that the medical care complained

of did not comply with the applicable standard of care. In addition, if a Court should later determine that anyone who has reviewed the medical care complained of in this Complaint does not meet the requirements to testify under Rule 702(b) or (c) of the North Carolina Rules of Evidence, then Lessie will seek to have such person(s) qualified as an expert witness by motion pursuant to Rule 702(e) of the North Carolina Rules of Evidence, and Lessie moves the Court (as provided in Rule 9(j) of the North Carolina Rules of Civil Procedure) that such person(s) be qualified as an expert witness under Rule 702(e) of the North Carolina Rules of Evidence.

## OBJECTION TO CAP ON NON-ECONOMIC DAMAGES FOR ALL MEDICAL MALPRACTICE CAUSES OF ACTION PURSUANT TO N.C. Gen. Stat. 90-21.19

165. The allegations in the Paragraphs above are incorporated by reference.

166. Lessie submits that N.C. Gen. Stat. § 90-21.19 cap on damages should not apply in this federal court action.

167. Lessie objects to N.C. Gen. Stat. § 90-21.19 which purports to place a cap on non-economic damages in a medical malpractice case, because it violates both the state and federal constitutions, and violates, among other things, Jamil's equal protection rights, due process rights, his right to equal and open access to the courts, the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers and the insurance companies that provide them with professional malpractice insurance as set forth in Amendments VII and XIV of the United States Constitution and

Article I, Sections 1, 6, 18, 19, 25, and 32 and Article IV, Sections 1 and 13 of the North Carolina Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Lessie, on behalf of Jamil, respectfully prays this Honorable Court that she have and recover judgment against Defendants, jointly and severally as follows:

1.      Compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000);

2.      Treble damages pursuant to N.C. Gen. Stat. § 162-55;

3.      Punitive damages in accordance with the law in an amount to be determined by a Jury;

4.      That the costs of this action including, but not limited to, pre-judgment and post-judgment interest charged at the legal rate and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law be assessed against Defendants from the time of the filing of this action until paid;

5.      For Jury trial on all issues of fact; and

6.      For any and all further relief as to the Court may seem just and proper.

This the 2nd day of August 2024.

*/s/ W. Ellis Boyle*
W. Ellis Boyle
N.C. State Bar I.D. No.:  33826
email:  docket@wardandsmith.com*
email:  weboyle@wardandsmith.com**
Hannah M. Daigle
N.C. State Bar I.D. No.:  60840

email:  hmdaigle@wardandsmith.com**
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC  27636-3009
Telephone:  919.277.9100
Facsimile:  919.277.9177
*Attorneys for Plaintiff*

*This email address must be used in order to effectuate service under Rule 5 of the North Carolina Rules of Civil Procedure.

** Email address to be used for all communications other than service.